# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-1194** (Kanawha County 08-F-473)

**Thomas G.,**
**Defendant Below, Petitioner**

**FILED**
**December 7, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Thomas G.,[1] by counsel Nigel E. Jeffries, appeals from the Circuit Court of Kanawha County's November 26, 2019, resentencing order. The State of West Virginia, by counsel Mary Beth Niday, filed a response in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

This case arises out of the rape and sexual assault of three victims, T.M., A.B., and M.C., on the West Side of Charleston in 2007 and 2008. Around the time of the events surrounding this matter, the Charleston Police Department received multiple reports of prostitutes being raped at knife point. The victims in this case were prostitutes whom petitioner solicited and then assaulted.

In October of 2007, T.M. was approached by petitioner, who was driving a gold Ford Explorer with a decal containing the word "nigga" on the driver's side window. After petitioner asked T.M. to perform oral sex, T.M. entered petitioner's vehicle and petitioner drove to the Sport Mart parking lot, where he held a knife to T.M's throat and raped her vaginally and anally.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

Petitioner threated to kill T.M. if she screamed or attempted to get away. T.M. tried to jump out of the passenger side door, but the handle was broken and the door would not open from the inside. After the assault, petitioner walked around the vehicle and opened the door for T.M. to exit the vehicle. T.M. reported the incident to the Charleston Police Department two days after the attack and she told the police that petitioner had also raped two other prostitutes with whom she was acquainted, A.B. and M.C..

Petitioner assaulted T.M. a second time and T.M. reported the crime to the Charleston Police Department that same night. The lead investigating officer with the Charleston Police Department transported T.M. to the police department and obtained T.M.'s statement. That same evening, an officer from the Charleston Police Department located and searched petitioner's car and found a switchblade knife within the reach of the driver's seat. Petitioner was transported to the police station where he gave an inculpatory videotaped statement.

Based upon information provided to the police by T.M., a detective from the Charleston Police Department met with A.B. at the South Central Regional Jail where she happened to be incarcerated. A.B. identified petitioner as her perpetrator. A.B. advised that while she was working as a prostitute on the West Side of Charleston, petitioner, driving a gold Ford Explorer, picked her up, and drove her to the Sport Mart parking lot. A.B. observed a decal on the driver's side window of petitioner's car that was consistent with T.M.'s description. Once they arrived at Sport Mart, petitioner placed a knife to A.B.'s throat and told her, "[y]ou are going to suck my dick or I will slice your throat."

A couple of months later, A.B., not recognizing petitioner's vehicle, got into the same vehicle with petitioner. A.B. then recognized petitioner and tried to jump out of the vehicle, but petitioner grabbed her and prevented her from doing so. Petitioner again drove A.B. to Sport Mart where he told her she was "going to give him some [sex] or he would kill her." A.B. tried to get away from petitioner, but he grabbed her by the throat and raped her.

M.C.'s interaction with petitioner was similar to that of the other victims. In May of 2007, M.C. was approached by petitioner in a car that matched the description given by the other two victims. Petitioner told M.C. he wanted oral sex and showed her money. Petitioner drove M.C. to the Sport Mart parking lot, pulled out a switch blade knife, and held the knife to her throat while stroking his penis. Petitioner told M.C. that if she was good she would not get hurt, and then he raped her. M.C. did not report the incident or go to the hospital, but in March 2008, M.C. spoke to an unnamed officer who handled street crimes about the incident.

Following petitioner's second encounter with T.M., the lead investigating officer ran petitioner's record through the department's record management system and found a photo of petitioner taken at the time of an earlier booking. The officer then created a photo array including photos of five other individuals and petitioner's photo from his earlier booking. The criteria used by the investigating officer to select the five other photos used in the array was a man "within five years of the [petitioner's] age, within fifteen pounds of the [petitioner's] weight, and within five inches of [petitioner's] height." Using this photo array, all three victims identified petitioner as their perpetrator.

Petitioner was indicted in September of 2008 on five counts of first-degree sexual assault in violation of West Virginia Code § 61-8B-3, and one count of second-degree sexual assault in violation of West Virginia Code § 61-8B-4. Petitioner's case was tried before a jury in August of 2009.

During closing arguments at petitioner's jury trial, the State's attorney remarked that petitioner was a wolf and a serial rapist. Further, the State's attorney told the jury that by failing to convict petitioner it would tell him "you go right ahead and you can do it, and anybody can do it, we don't care, it's okay." Notably, petitioner did not object to these remarks at trial.

During jury deliberations, the jury foreperson sent a note to the judge requesting that the jury be allowed to re-watch petitioner's taped statement. The statement had previously been played for the jury during the trial and had been pre-marked as State's exhibit three. The trial court consulted with counsel on whether to grant the jury's request. After a discussion on the record, the judge determined that it would grant the jury request. Thereafter, petitioner's statement was sent back to the jury room.

The jury returned its verdict. Petitioner was acquitted on one count of first-degree sexual assault and was convicted of the remaining five counts. He was sentenced to an indeterminate term of imprisonment of fifteen to thirty-five years on each of the four counts of first-degree sexual assault and an indeterminate term of ten to twenty-five years on the one count of second-degree sexual assault, with his sentences to run concurrently.

Petitioner was resentenced for the purpose of an appeal and he appeals from this resentencing order. On appeal, petitioner raises three assignments of error, which he concedes were not raised in the proceedings below: (1) petitioner alleges that the he was denied due process when the trial court permitted the jury to re-watch his videotaped statement during deliberations when the exhibit was not admitted into evidence at trial; (2) he argues that the circuit court committed plain error when it allowed his out-of-court identification based on an impermissibly suggestive photo array; and (3) he alleges that the State made improper and prejudicial remarks during its rebuttal closing arguments. We will address each argument in turn.

As noted above, petitioner concedes that he did not object to the alleged errors before the trial court. Thus, the State argues that petitioner waived the issues when he failed to raise them below. We have held that "[a]s a general rule . . . errors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there." Syl. Pt. 1, in part, *State v. Salmons*, 203 W. Va. 561, 509 S.E.2d 842 (1998) (citation omitted).

Since petitioner did not raise the issues before the circuit court, they are subject to a plain error analysis. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). In *Miller*, we held that "[h]istorically, the 'plain error' doctrine 'authorizes [an appellate court] to correct only 'particularly egregious errors' . . . that 'seriously affect the fairness, integrity or public reputation of judicial proceedings[.]'" 194 W. Va. at 18, 459 S.E.2d at 129.

First, petitioner maintains that the circuit court erred when it allowed the jury to re-watch his statement during its deliberations, arguing that the exhibit was not admitted at trial. The State maintains that the statement was admitted into evidence and, therefore, the jury was entitled to watch the statement during its deliberations. Although the appellate record reflects that there may have been confusion as to whether the statement was admitted at trial, the parties stipulated to its admissibility prior to the trial, a point that was conceded by petitioner's counsel. Further, after reviewing the record, we agree with the State's position that the statement was properly admitted at trial.

The videotaped statement was discussed when the State's attorney was questioning a detective at trial. Contemporaneous with the questioning, the State's attorney indicated "I want to put in State's Exhibit Three, which is the videotape." Notably, petitioner's counsel did not object. Later, after the jury requested the opportunity to view the statement again during its deliberations, the following exchange occurred on the record:

> The State: It was marked and admitted as an exhibit. Remember, I stopped the tape and said this [is] admitted, and you said yes. It is an exhibit that's in evidence. It's no different th[a]n the knife, it's no different th[a]n the Miranda form.

> The Court: Had I admitted it or you were asking me to admit it? You confused me a little bit on that.

> The State: Decided pretrial it was admitted. And then I stopped and said, Your Honor, this is admitted. And you said, yes.

> The Court: You were confirming that it was.

> The State: The defense stipulated that it was admitted. It's an exhibit.

> Petitioner's Counsel: He's got a point on that one, Judge.

> The State: We couldn't have played it, if it wasn't admitted. It's an exhibit in this case.

> The Court: Well, if it is an exhibit in the case then, you win. You are entitled to show it. All exhibits are able to be reviewed. It's not like testimony, it is an exhibit. It is different th[a]n testimony.

> Petitioner's Counsel: I think we ought to let Jimmy take his TV back to the jury room and let them watch it on their own TV.

As noted by this exchange, counsel for petitioner conceded that his statement was an exhibit. Since this exhibit was admitted into evidence, it was appropriate for the jury to be able to review the statement during its deliberations. This Court has held:

> "The jury, during deliberations, may use an exhibit, admitted into evidence, according to its nature and within the bounds of the evidence at trial in order to aid the jury in weighing the evidence, and the jury may make a more critical examination of an exhibit than was made during the trial."

Syl. Pt. 6, *State v. Armstrong*, 179 W. Va. 435, 369 S.E.2d 870 (1988). Given that petitioner's statement was admitted in evidence, it was appropriate for the jury to take a second look at it when it weighed the evidence during its deliberations. Therefore, the circuit court did not commit plain error and, therefore, this assignment of error fails.

Next, petitioner maintains that the circuit court erred when it allowed the jury to hear evidence of petitioner's out-of-court identification based on what he claims was an impermissibly suggestive photo array. The State argues that the photo array was not impermissibly suggestive. Based upon our established precedent, we agree with the State.

It is well established that Due Process governs the admissibility of an out-of-court identification arising from the use of a pretrial photographic lineup. *Neil v. Biggers*, 409 U.S. 188 (1972). In *State v. Kennedy*, 162 W. Va. 244, 249 S.E.2d 188 (1978), this Court set out the following test based upon *Biggers* and its progeny:

> "In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Syl. pt. 3, *State v. Casdorph*, W.Va., 230 S.E.2d 476 (1976).

162 W. Va. at 244, 249 S.E.2d at 189, syl. pt.1.

Further, the United States Supreme Court has held that photographic identifications can be impermissibility suggestive. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967 (1968).

In this case, the lead investigating officer testified regarding the department's record management system, the criteria used to generate the photo array, and the photo array itself. Specifically, the lead investigating officer testified that she created the array of six photos by using the department's record management system and criteria such as age, height, and weight to find other photographs of men in the booking system who were "within five years of the [petitioner's] age, within 15 pounds of the [petitioner's] weight, and within five inches of the [petitioner's] height." Additionally, the investigating officer testified that all six individuals in the photo array, including petitioner, were African Americans. Based upon the totality of the circumstances, it does not appear that the photo array was impermissibly suggestive. Moreover, the victims also made in-court identifications of petitioner. Thus, we find that the circuit court did not plainly err in permitting the jury to hear evidence of the victims' out-of-court identifications of petitioner.

Finally, petitioner asserts that that the trial court erred when it allowed the State's improper and prejudicial remarks during rebuttal closing argument. The State maintains that the three isolated statements noted above were neither improper nor prejudicial. Applying this Court's jurisprudence to the facts of this matter, we agree with the State.

In syllabus point 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995), we held that "[a] judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." In *Sugg*, this Court established a four-part test to examine whether a prosecutor's comments require reversal.

Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

193 W. Va. at 393, 456 S.E.2d at 474, syl. pt. 6.

Analyzing the statements at issue in this appeal pursuant to *Sugg*, we find that the statements are not so damaging as to require reversal. First, petitioner was charged with raping three women, and, therefore, the State's comment that he was a rapist or a wolf were within the ambit of the charges and did not have a tendency to mislead the jury. Additionally, the statement by the prosecutor that a "not guilty" verdict would tell petitioner and the community that his actions were acceptable, was also not so egregious to be prejudicial or misleading. As to the second *Sugg* factor, the purported improper statements were not pervasive, but instead were isolated and relegated only to the State's rebuttal closing argument. Turning to the third *Sugg* factor, there was overwhelming evidence to establish petitioner's guilt absent the statements and, therefore, the statements likely had no impact on the jury's verdict. Finally, the fourth *Sugg* factor fails insofar as there is no evidence that the State's comments were deliberately placed to divert the jury's attention to extraneous matters. Thus, pursuant to *Sugg*, we conclude that the prosecutor's comments were not so damaging as to require reversal, and we therefore reject petitioner's final assignment of error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** December 7, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison